UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,　　　　　　　　CRIMINAL NO. 09-02 (ADM/JSM)

　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　REPORT AND RECOMMENDATION

DONALD REGINALD RICHARDS,

　　　　Defendant.

JANIE S. MAYERON, United States Magistrate Judge

　　　　The above matter came on for hearing before the undersigned on March 13, 2009 upon defendant Donald Reginald Richards' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 22] and Motion to Suppress Statements, Admissions and Answers [Docket No. 23].  Lisa Kirkpatrick, Assistant United States Attorney, appeared on behalf of the United States of America; Douglas Olson, Esq. appeared on behalf of defendant Donald Reginald Richards, who was personally present.  The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

　　　　Based upon the pleadings, the pre-hearing and post-hearing submissions and the testimony of Detective Mari Askerooth, Sergeant William Stevens, and Special Agent Travis Hamblen at the hearing on March 13, 2009, it is recommended that defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 22] and Motion to Suppress Statements, Admissions and Answers [Docket No. 23] be denied.

**I.     INTRODUCTION**

Defendant is charged one count of Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1) and 924(e). <u>See</u> Indictment [Docket No. 6]. Defendant has now moved to suppress evidence seized during his allegedly illegal detention, as well as subsequent statements that he made following his arrest.

**II.    MOTION TO SUPPRESS EVIDENCE [DOCKET NO. 22]**

   **A.    <u>Facts</u>**

At the hearing on March 13, 2009, Detective Mari Askerooth testified that she has been a detective in the narcotics interdiction unit for seven years. The purpose of that unit is to intercept large amounts of narcotics coming in and money going out of the state of Minnesota. Interdictions are conducted at the airport, on buses and trains, and in hotels and motels in the area.

Detective Askerooth generally explained the purpose and procedure for an interdiction as follows: bus interdictions are based on consensual encounters. Four to five officers dressed in plainclothes are generally present – one dog handler, two "spotters" on the bus for officer safety, and one to two officers who actually perform the interdictions and talk to individuals on the bus. The officers quietly board the bus, one officer starts in the back and another in the middle, and they talk to everyone on the bus individually. There are no weapons displayed, and the officers do not wear any police insignias on their clothing. They do not block the aisles.

When speaking to a passenger, the officer introduces himself or herself as a police officer, shows their credentials and then immediately puts them away. The officer explains to the individual that he or she is not under arrest and is not being detained,

asks for permission to speak with the person, and informs the individual that he or she can refuse to talk to the officer.  The officer asks if they can go through the individual's luggage and pat them down.  People are free to decline, and if they do, the officer moves on to the next person.  Thus, during an interdiction, officers get consent to first have a conversation with individuals, and then obtain consent to search their bags.

Detective Askerooth testified that on December 2, 2008, she was working with Sergeant Stevens and two ICE agents to interdict a Jefferson Lines bus from Texas that was arriving at approximately 11:00 a.m. at the transit center located at the Minneapolis-St. Paul Airport.  This particular bus came from the Texas–Mexico border and officers interdict it frequently because the Texas-Mexico border towns are a source of narcotics.  All of the interdicting officers were dressed in plainclothes.

Sergeant William Stevens testified that on December 2, 2008, the bus was approximately half full, and that he and the other officers did not announce police presence.  Sergeant Stevens' procedure was to make contact with a passenger, introduce himself, show his police identification and then put it away, tell the person he or she was not under arrest, and ask if the person would agree to answer a few questions.  If the person agreed, he would ask where the passenger was coming from, where he or she got on the bus, and where he or she was going.  Sergeant Stevens then would ask to see the passenger's ticket to verify their answer.  Sergeant Stevens would also explain to the passenger that he was looking for drugs, weapons and large amounts of cash, and then ask if the individual had those items and whether he could search their belongings.  Sergeant Stevens indicated that people often agree to a search, but that when they declined, he moved on.

Sergeant Stevens stated that defendant was seated about three-quarters back in the bus on the left side; there was an open seat next to defendant and one across the aisle. Sergeant Stevens asked defendant if he could ask him a couple of questions, and defendant said okay. In response to Sergeant Stevens' questions, defendant stated that he got on in Des Moines and was going to St. Cloud to pick up his daughter. He also showed Sergeant Stevens his ticket. Defendant stated that he did not have any drugs or guns. When Sergeant Stevens asked if he could search defendant's belongings, defendant refused, stating that he had not done anything wrong.

Sergeant Stevens testified that during the conversation, defendant was seated, Sergeant Stevens was standing behind him, and the aisle was open. As they began talking, Sergeant Stevens moved to the seat across the aisle from defendant. Defendant had his backpack in the seat next to him, and had his arm on the backpack off and on. Sergeant Stevens never asked defendant for identification during the conversation. He made the decision not to ask for identification after defendant declined the luggage search, and testified that it was not protocol to ask for identification after a search was declined.

After defendant stated that he did not want Sergeant Stevens to search him, Sergeant Stevens stopped the encounter, and went to the next passenger. After about a minute, he heard Detective Askerooth on the phone saying something about a felony warrant. Detective Askerooth then told Sergeant Stevens that defendant had a warrant. Detective Askerooth arrested defendant and handed Sergeant Stevens defendant's backpack.

Detective Askerooth testified that she was speaking to individuals on the bus with Sergeant Stevens, and the two ICE agents were assigned as spotters. Detective Askerooth boarded the bus first, proceeded to the back and began talking to individuals. Detective Askerooth did not overhear the conversation between Sergeant Stevens and defendant. Detective Askerooth noticed that Sergeant Stevens had cleared the defendant, but she thought defendant was acting odd – he exhibited nervous behaviors, he kept looking at Detective Askerooth and then back toward Sergeant Stevens, and he was shaking and sweaty. Detective Askerooth stopped talking with the individual with whom she was speaking, and approached defendant and identified herself as a police officer. She showed him her credentials, put her credentials away, asked if she could speak to him and he agreed. She then asked if she could see his identification, to which he agreed and he produced it to her. Defendant was extremely agitated and visibly shaking almost uncontrollably. His hand was shaking so hard that he could barely hold his identification when he gave it to Detective Askerooth. He was sweaty and had a dry mouth. Detective Askerooth stated that he was one of, if not the most, nervous person she had ever seen during an interdiction. Detective Askerooth asked defendant why he was nervous, and he said that he had a nervous medical condition that caused him to shake.

Detective Askerooth testified that she is experienced in observing people's behavior, and trained to notice behaviors during consensual encounters. Most people have a mild or normal level of nervousness. On the other hand, in her experience high-end nervousness indicates to her that an individual is hiding something or criminal activity. Prior to the time defendant handed her his identification, Detective Askerooth

stated that his behavior was so overt that she would have talked to him more even if he had declined.

Detective Askerooth did not ask to go through defendant's bag because she assumed that Sergeant Stevens had already asked him and had not received consent from defendant to search it.

When she asked for defendant's identification, Detective Askerooth was standing in the aisle and wearing a gun under her sweatshirt. If defendant had wanted to get up, he would have had to walk by four officers. Detective Askerooth testified that at that point, she would not have let him leave the bus due to his behavior. Regardless of whether he had given her his identification, she would have detained him because of his overt actions.

Detective Askerooth called dispatch to see if he had any warrants. Detective Askerooth was informed that he had an outstanding felony warrant in Ramsey County. Based on this information, Detective Askerooth told defendant to stand up, handed his backpack to Sergeant Stevens, and escorted defendant off the bus. Once defendant was arrested, the officers stopped questioning other passengers.

After defendant was arrested, Detective Askerooth and Sergeant Stevens took him to the airport police substation. Sergeant Stevens began searching defendant's bag in the room, and among other items, he felt something hard in a towel, which he believed was a gun. Sergeant Stevens asked defendant whether he had a gun in the bag, and defendant replied "I don't know, maybe." Sergeant Stevens did not remove the gun at this time because he knew he would have to secure it and there was no place to do that in the substation. Additionally, he was not wearing any gloves.

6

Sergeant Stevens then transported defendant to the main police station, but did not talk to him. When they arrived at the main office, Sergeant Stevens took the bag into the conference room, took the gun out of the bag and removed the gun's magazine.

Detective Askerooth filled out the booking paperwork, read defendant his <u>Miranda</u> rights, and interviewed him. A copy of that interview recording was admitted at the motions hearing as Gov't Ex. 1. During the interview, Detective Askerooth was still in plainclothes, had no weapons, and defendant was not handcuffed. She did not threaten defendant or make any promises, and defendant did not request a lawyer or ask to stop the interview at any time. Detective Askerooth believed that defendant understood the questions. Defendant was crying, visibly upset and holding his stomach. The interview lasted approximately 10-15 minutes.

Special Agent Travis Hamblen with Immigrations and Customs Enforcement, also testified at the hearing. He testified that he was working the planned interdiction on the bus on December 2, 2008 as a spotter on the bus. He stood in front of the seats and faced the back of the bus. He was dressed in plainclothes and carried a concealed weapon, as did all of the officers.

Agent Hamblen noticed defendant when he boarded the bus because defendant appeared to be either sleeping or feigning sleep to avoid contact. Agent Hamblen stated that it was unusual to find someone asleep at the bus terminal because there is a lot of activity going on. Within thirty seconds of boarding the bus, Sergeant Stevens had contact with defendant, although Agent Hamblen did not overhear that conversation.

Agent Hamblen watched defendant talking to Sergeant Stevens. Defendant appeared extremely nervous. He was looking around, his hands were shaking, and he

7

was looking forward and backward at the positioning of the officers on the bus. Detective Askerooth had her back turned to defendant, which worried Agent Hamblen regarding her safety. After Sergeant Stevens stopped speaking with defendant, defendant became even more nervous. According to Agent Hamblen, defendant seemed terrified, and was shaking when approached by Detective Askerooth. According to Agent Hamblen, it is very rare for a person to be so nervous.

The officers were on the bus for approximately five to ten minutes before defendant was arrested. The interdiction ceased after defendant was arrested because at that point there were not enough officers to safely conduct the interdiction.

Agent Hamblen did not go inside the police substation with Sergeant Stevens and Detective Askerooth. However, upon arriving at the main station, Agent Hamblen went into the interview room with defendant. The room was approximately fifteen by eight feet, had no door on it, and contained a table and a couple of chairs. Defendant agreed to speak with the officers. Detective Askerooth read defendant his <u>Miranda</u> rights.

On December 4, 2008, Agent Hamblen spoke again with defendant at the Ramsey County Adult Detention Center. Agent Hamblen testified that he follows up with people who are arrested and listens to their jail calls. During one call, defendant was heard speaking to a female and alluded to the fact that a third party had set him up, and they needed to "get even" – to harm that person.

Agent Hamblen went to the area where defendant was being held to interview him. A copy of that interview recording was admitted at the motions hearing as Government Exhibit 2. Defendant was in custody, was not handcuffed, and Agent

Hamblen <u>Mirandized</u> defendant. Agent Hamblen was dressed in plainclothes, and had no weapon. Defendant agreed to speak with Agent Hamblen. There were no threats or promises made by Agent Hamblen, and defendant did not ask to stop or ask for an attorney. Defendant understood Agent Hamblen's questions. Defendant was eager to talk with Agent Hamblen and went into great detail. They spoke for about ten to fifteen minutes. Defendant did not appear to be under the influence. During the interview, defendant spoke about some health problems and medical issues. Agent Hamblen had checked defendant's criminal history previously, and discovered that defendant had three felony convictions, and extensive contact with the police.

### B. <u>Discussion</u>

Defendant moved to suppress the evidence obtained as a result of the seizure and search of defendant based on the following grounds: 1) the officers lacked reasonable suspicion or other legal justification for the initial detention and questioning of defendant; 2) the stop, seizure and detention of defendant on the bus was a violation of the Fourth Amendment; 3) the officers lacked reasonable suspicion or other legal justification to detain the defendant and request that he provide them with identification in violation of the Fourth Amendment; 4) the subsequent discovery of the handgun in his backpack was the result of these illegal actions and constituted a fruit of the illegalities; and 5) the arrest of defendant was the result of his illegal seizure. Def. Mem., p. 1. [Docket No. 33]. Additionally, defendant claimed that his subsequent statements constituted fruits of the illegal seizure, search and arrest and should be suppressed. <u>Id.</u>, p. 2.

In response, the Government maintained that consensual encounters do not implicate the Fourth Amendment, and that the police conduct in this case was lawful. Gov't Response, pp. 5-6 [Docket No. 40].

> There are three categories of police encounters: (1) consensual communications involving no coercion or restraint, (2) Terry stops -- minimally intrusive seizures that are significant enough to invoke the Fourth Amendment and must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause. United States v. Johnson, 326 F.3d 1018, 1021 (8th Cir. 2003); see generally Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
>
> A consensual encounter does not implicate the Fourth Amendment. United States v. Hathcock, 103 F.3d 715, 718 (8th Cir. 1997). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Vera, 457 F.3d 831, 834 (8th Cir. 2006), quoting United States v. Drayton, 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). "Mere police questioning does not constitute a seizure." United States v. Barry, 394 F.3d 1070, 1074 (8th Cir. 2005), quoting Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); Hathcock, 103 F.3d at 719; United States v. Slater, 411 F.3d 1003, 1005 (8th Cir. 2005). A consensual encounter becomes a seizure implicating the Fourth Amendment when, considering the totality of the circumstances, the questioning is "so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave." Hathcock, 103 F.3d at 718, quoting United States v. McKines, 933 F.2d 1412, 1419 (8th Cir. 1991) (en banc); see also Johnson, 326 F.3d at 1021; INS v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

United States v. Flores-Sandoval, 474 F.3d 1142, 1144-45 (8th Cir. 2007).

Defendant contended that after the officers initiated a consensual encounter in this case, and defendant refused to let him search his luggage, the consensual encounter was over. Def. Mem., p. 6. According to defendant, the re-initiation of contact by Detective Askerooth and subsequent encounter with her was non-consensual. Id. Defendant asserted that by re-engaging him for a second time, the

10

officers were communicating they were not satisfied with his answers during the initial consensual encounter and were not going to let him go until they questioned him further. Id., p. 7. In sum, defendant argued that by re-approaching defendant after he had terminated the consensual encounter, Detective Askerooth was communicating that he was not free to terminate the encounter, his compliance in her request for his identification was required, and he was seized in violation of the Fourth Amendment. Id., p. 7. The Court disagrees.

The Supreme Court has held that a seizure does not occur when law enforcement boards a bus to "ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage – so long as the officers do not convey a message that compliance with their requests is required." Bostick, 501 U.S. at 437; see also Drayton, 536 U.S. at 201 ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage-provided they do not induce cooperation by coercive means."). Here, there was no message conveyed by officers that compliance was required. The officers were dressed in plainclothes, did not have weapons out, only displayed their credentials briefly at the beginning of each conversation, and beginning at the back of the bus, began to speak to each passenger individually. Both Detective Askerooth and Sergeant Stevens testified that they first asked defendant's permission to ask him questions, and he agreed to speak with both officers. Furthermore, when Sergeant Stevens asked to look in defendant's bag, defendant said no, and when Detective Askerooth asked defendant if he would be willing to provide her with identification, he agreed to do so and produced

it to her. Defendant's conduct indicated that he knew he had the option to consent or to decline the officer's requests.

Defendant argued that because an officer was standing in the aisle, there were three other officers between him and the front of the bus, and because he had refused to permit a search of his luggage, he was effectively seized. Def. Mem., pp. 6-7. This reasoning has no merit. There is no testimony that any officer was stationed in the aisle during the interdiction in this case; rather, the testimony was that the officers moved in and out of the aisle as they questioned people, and deliberately did not stand in the aisle. See United States v. Angulo-Guerrero, 328 F.3d 449, 451 (8th Cir. 2003) (bus passengers not seized during interdiction where officer was moving down the aisle to make sure all passengers were questioned, and not to prevent them from leaving). Additionally, the fact that the two "spotters" were stationed in front of the bus did not render defendant seized. In Drayton, where a routine drug interdiction took place on a Greyhound bus under similar circumstances, officers dressed in plain clothes and carrying concealed weapons and visible badges boarded the bus; similar to this case, two officers went to the rear of the bus and one remained stationed in front to observe. 536 U.S. at 197. The Supreme Court found that the bus passengers were not effectively seized when the officers boarded the bus and began asking questions because the officers gave passengers no reason to believe they were required to answer the officers' questions, and because "there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." Id. at 204.

The Court also rejects, as argued by defendant, that because his first consensual encounter with Sergeant Stevens was terminated by his refusal to permit a search of his bags, the subsequent encounter with Detective Askerooth was not consensual. When Detective Askerooth approached defendant, she asked his permission to ask him questions and defendant agreed. The only conduct differentiating Detective Askerooth's encounter with defendant from Sergeant Steven's encounter is that she asked defendant for identification, and importantly, she asked <u>permission</u> to see defendant's identification, rather than demanding it. "Even without a basis to suspect a person, officers may ask to see the person's identification and request consent to search the person's luggage if the officers do not convey a message that the person must comply." <u>United States v. Jones</u>, 990 F.2d 405, 408 (8th Cir. 1993) (citing <u>United States v. Todd</u>, 963 F.2d 207, 210 (8th Cir. 1992). <u>See</u> <u>also</u> <u>Bostick</u>, 501 U.S. at 435 (law enforcement may ask to examine an individual's identification without implicating a Fourth Amendment interest).

"In order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." <u>Bostick,</u> 501 U.S. at 439. The Court concludes that, in light of the circumstances of the encounter, a reasonable person would have felt free to decline to answer the officers' questions, refuse to produce identification and terminate the encounter. Instead, defendant twice agreed to answer the officers' questions after they asked permission, and then agreed to produce identification after Detective Askerooth

asked for it.  The Court concludes that defendant was not seized at the time he was questioned by Detective Askerooth.

Finally, even if the Court were to conclude that Detective Askerooth's encounter with defendant was not consensual, as argued by the Government, Detective Askerooth had reasonable suspicion to request permission to see defendant's identification.  See Gov't Mem., p. 6.  Defendant submits that Detective Askerooth had no evidence warranting a reasonable belief that defendant was engaged in criminal conduct, and that his nervousness did not justify his seizure.  In opposition, the Government contended that the officers had reasonable suspicion based on Agent Hamblen's observation that defendant was feigning sleep and that Detective Askerooth determined defendant's behavior to be some of the most overt acts of nervousness she had every seen.

Reasonable suspicion requires "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed."  United States v. Donnelly, 475 F.3d 946, 952 (8th Cir. 2007) (quotation omitted); see also Terry v. Ohio, 392 U.S. 1, 20-21 (1968).  "[N}ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (citing United States v. Brignoni-Ponce, 422 U.S. 873 (1975); Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (per curiam); United States v. Sokolow, 490 U.S. 1, 8-9 (1989)); see also United States v. Bloomfield, 40 F.3d 910, 918-19 (8th Cir. 1994) (explaining nervousness and other subjective perceptions are valid factors supporting reasonable suspicion).

In addition to the feigned sleep and extreme nervousness displayed by defendant, Sergeant Stevens testified that defendant moved his hand off and on top of his backpack in the seat next to him. Further, both Agent Hamblen and Detective Askerooth testified that defendant kept looking back and forth at the positioning of the officers. The Court also notes that this particular bus originated at the Texas-Mexico border, and was frequently interdicted for drugs by law enforcement. Based on the totality of the circumstances, Detective Askerooth had reasonable suspicion to request defendant's identification.

In summary, the Court finds that defendant's encounters with both Sergeant Stevens and Detective Askerooth were consensual. As such, the encounters did not implicate the Fourth Amendment. However, even if defendant's encounter with Detective Askerooth was determined to be nonconsensual, the Court also finds that the seizure was warranted because she had a reasonable suspicion that a crime was being committed to justify her further questioning of him and to request his identification. Having found that the questioning of defendant was legal, the subsequent discovery of the handgun in his backpack and his arrest do not constitute fruits of the poisonous tree. For all of these reasons, this Court recommends that defendant's motion to suppress evidence be denied.

### III.  MOTION TO SUPPRESS STATEMENTS, ADMISSIONS AND ANSWERS [DOCKET NO. 23]

Defendant claimed that his subsequent statements to police constituted fruits of his illegal seizure, search and arrest and should be suppressed on that basis. Def. Mem., p. 2. As discussed above, the Court has determined that defendant's search and arrest were legal. Accordingly, it rejects defendant's argument that the statements

15

should be suppressed as fruits of the poisonous tree, and defendant's motion to suppress his statements should be denied.

## IV. RECOMMENDATION

In light of the foregoing analysis, it is recommended that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 22] be denied; and

2. Defendant's Motion to Suppress Statements, Admissions and Answers [Docket No. 23] be denied.

Dated: April 17, 2009

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **April 23, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief by April 27, 2009. All briefs filed under this Rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.